IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA S. LOSH, | ) | CASE NO. 5:15CV980 |
| | ) | |
| Petitioner, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| CAROLYN COLVIN ACTING | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

## I.       Introduction

Plaintiff, Debra S. Losh ("Losh"), seeks judicial review of the final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.       Procedural History

Plaintiff applied for supplemental security income in July 2011.  (Tr. 147.)  Ms. Losh alleged her disability began on April 1, 2010. (Tr.147.)  Ms. Losh's application was denied initially (Tr.111-114) and after reconsideration (Tr. 118-124).   On July 13, 2012, Ms. Losh requested an administrative hearing (Tr.125-126).

A hearing was held before the Administrative Law Judge ("ALJ"), Thomas A. Ciccolini, on November 6, 2013.  (Tr. 40.)  The ALJ issued a decision on December 9, 2013, finding that Losh was not disabled.  (Tr. 18-35.)  On February 7, 2014, Losh requested a review of the ALJ's

decision by the Appeals Council (Tr. 7).  The Appeals Council denied review, rendering the ALJ's December 9, 2013 decision final (Tr. 1).

III.    **Evidence**

    **A.  Personal, Educational and Vocational Evidence**

Losh was born on November 5, 1956 and was 55 years old on the date her application was filed.  (Tr. 147.)  She has a high school equivalency education. (Tr. 46.)  Losh's past relevant work includes nanny, cashier, customer service representative and telephone operator. (Tr. 54.)

    **B.  Medical Evidence**

        **1.  Medical Records Related to Physical Impairments**

On May 22, 2010, Ms. Losh presented to the emergency room complaining of "left knee pain on and off for years" but "worse today."  (Tr. 285-303)  Plaintiff reported a history of a torn meniscus but said that she had not gone for follow-up because she could not be off work that long.   (Tr. 288)   X-rays revealed mild medial and lateral compartment narrowing and degenerative changes about the patellofemoral joint, but no acute bony abnormalities or any evidence of joint effusion or soft tissue abnormalities.  (Tr. 293)  Plaintiff was given a prescription for pain and was discharged.  (Tr. 291)

On May 24, 2010, plaintiff had a follow-up appointment with Meghan Sullivan, M.D. (Tr. 306-307)  Plaintiff reported that she had injured her knee three years ago when she fell on ice. (Tr. 306)  She had been unable to afford medical treatment due to a lack of insurance.  (Tr. 306)  She complained that the pain was now severe and that it was also causing hip pain.  (Tr. 306)  Dr. Sullivan's notes indicate that plaintiff had been using a cane during the last couple of days to walk.  (Tr. 306)  Plaintiff also told Dr. Sullivan that she was required to stand the entire

2

shift at work unless she had a doctor's note.  (Tr. 306)  Plaintiff did not report any back pain at this visit. (Tr. 306-307)  A physical examination revealed some tenderness to palpation of the medial knee with some mild swelling.  (Tr. 307)  No effusion was appreciated and there was no tenderness to palpation of plaintiff's left hip.  (Tr. 307)  Plaintiff was referred to another physician for evaluation.  (Tr. 307)  She was advised to continue taking NSAIDs, given a handout for quad strengthening, and advised that she needed to lose weight.  (Tr. 307)

In August 2011, plaintiff had an appointment with Rosanna Dean-Scott, M.D. for a pulled muscle in her left shoulder.  (Tr. 313)  She was diagnosed with a muscle sprain and strain and was given a prescription for Ibuprofen.  (Tr. 314)  Later in August, at a follow-up appointment with Charles Dhyanchand, M.D., plaintiff complained of right hip and left knee pain. (Tr. 311)  Dr. Dhyanchand's notes state "history of damaged meniscus 5 years ago."  (Tr. 311)  Plaintiff denied any swelling in her knee or hip area but described her pain as moderate to severe.  (Tr. 311)  Dr. Dhyanchand observed tenderness at the anterior of plaintiff's left knee, but no swelling, redness or warmth.  (Tr. 311-312)  Examination of her lumbar spine was noted as unremarkable.  (Tr. 311)  Dr. Dhyanchand referred plaintiff to physical therapy and prescribed pain medication. (Tr. 312)

On October 4, 2011, plaintiff presented as a new patient with Scott Hamler, M.D.  (Tr. 337-339)  Plaintiff complained of right hip and left knee pain.  (Tr. 337)  She also complained of emotional issues/frustration.  (Tr. 337)  Dr. Hamler's notes indicate that plaintiff's weight was 338 pounds and that plaintiff was in "no acute distress." (Tr. 338)  However, plaintiff had an antalgic gait.  (Tr. 338) Straight leg testing was negative bilaterally.  (Tr. 338) On exam, Dr. Hamler noted bilateral paraspinal tenderness.  (Tr. 338-339)  He also noted lumbar spine and right gluteal tenderness to palpation.  (Tr. 339)  Plaintiff's left knee was also tender to palpation

3

with localized swelling and mildly decreased range of motion.  (Tr. 339)  Dr. Hamler diagnosed bursitis, degenerative meniscus change and arthritis in her left knee, hip and lumbar spine and sciatica on her right side. (Tr. 337) Dr. Hamler administered a pain injection to plaintiff's left knee at the initial visit.  (Tr. 337-339)

Plaintiff saw Dr. Hamler again on December 6, 2011.  (Tr. 334-335)  She complained of anxiety attacks one to two times per month.  (Tr. 335)  Dr. Hamler prescribed Xanax for plaintiff's occasional anxiety.  (Tr. 334)  Plaintiff also received a pain injection due to continued pain in her right hip and buttock that radiated into her knee and calf.  (Tr. 334-335)  Dr. Hamler also ordered an MRI of plaintiff's lumbar spine.  (Tr. 334)

Plaintiff underwent a MRI on December 9, 2011.  (Tr. 340-341)  The MRI revealed bulging discs, short pedicles, and facet arthropathy throughout plaintiff's lumbar spine.  (Tr. 340-341)  There was moderately severe spinal canal stenosis at L3-L4 and L4-L5 with moderate stenosis at L2-L3.  (Tr. 340-341)

On March 2, 2012, plaintiff presented to Dr. Hamler for a refill of her prescriptions.  (Tr. 331)  Dr. Hamler diagnosed left knee pain, lumbar spinal stenosis and pes anserine bursitis.  (Tr. 331)   Dr. Hamler administered an injection in plaintiff's left knee.  (Tr. 331-332)  Plaintiff received additional knee injections on April 24, 2012 and May 22, 2012 and was referred to physical therapy.  (Tr. 370, 373, 374)  An X-ray of plaintiff's left knee taken in May 2012 confirmed early degenerative joint disease diagnosis.

Plaintiff attended four physical therapy sessions between May 2012 and August 2012.  (Tr. 343-58, 386-415)  She was discharged in August 2012.  (Tr. 387)  Physical therapy notes state that plaintiff reported a 10% improvement overall with physical therapy, with increased hip mobility, increased lower quadrant strength and increased lower quadrant flexibility.  (Tr. 387)

4

Plaintiff met with orthopedic surgeon, Christopher Myer, M.D. on June 12, 2012. (Tr. 419)  Dr. Myer declined to offer a surgical option for plaintiff's knee because he felt that she needed to lose weight.   (Tr. 419)   He recommended that she continue therapy, anti-inflammatories and epidural steroid injections.  (Tr. 419)

Plaintiff presented to Dr. Hamler for follow-up in July 2012. (Tr. 368-369)  Plaintiff complained of continued pain in her right hip and in her left knee.  (Tr. 368)  Dr. Hamler's notes show that plaintiff was referred to an orthopedic surgeon.  (Tr. 368)

On August 8, 2012, plaintiff presented to Dr. Adam Land at the St. Thomas Hospital Orthopedic Clinic.  (Tr. 418)  Plaintiff received an injection to her left knee.  (Tr. 418)  Dr. Land also recommended that plaintiff try aquatic therapy because she was having too much pain to walk and that she consult a dietician.  (Tr. 418)  At her following appointment on October 17, 2012, Dr. Eric Miller's notes state, "I explained [to] the patient the importance of being compliant with the dietitian consult as well as the aquatic therapy.  Both were recommended to her in August and she has failed to comply with either of these.  I explained that if surgery became necessary down the road, it will be difficult to build a case if she had not been compliant with the conservative option."  (Tr. 417)

Dr. Hamler referred plaintiff to Dr. J. Tim Sable and she had an appointment with Dr. Sable on September 14, 2012.  (Tr. 446)  At this initial appointment, plaintiff complained of severe pain in her left knee, right hip and low back. (Tr. 446)  Dr. Sable noted that Ms. Losh was in "no acute distress" but walked with an antalgic gait favoring her right leg.  (Tr. 446-447)  Dr. Sable administered a lumbar epidural steroid injection and started her on Vicodin and Toprimate. (Tr. 446-447)

5

Plaintiff had a follow up appointment with Dr. Sable on October 19, 2012. (Tr. 444)  His notes state that plaintiff's pain was exacerbated by general movement.  At this appointment plaintiff stated that she "has minimal back and leg pain, more hip and knee pain caused by her arthritis."  (Tr. 444)  Plaintiff did not want to pursue injections, physical therapy or adjuvants medication.  "She has reasons for not trying anything but Vicodin."  (Tr. 444)  Dr. Sable observed "diffuse myofascial tenderness in low back," and "left knee crepitus [with] no effusion."  He refilled her prescription for Vicodin but gave her instructions for long term pain management and told her there would be no increase of her Vicodin in the future.  (Tr. 445)

The next medical records are from June 2013 when plaintiff returned to Dr. Hamler reporting that her "aches and pains seem to be getting worse involving knees and back [with] radiation into buttock and hips, despite weight loss." (Tr. 425)  Plaintiff reported that she had numbness and tingling and her legs seemed to be getting weaker.  (Tr. 425)  Dr. Hamler noted that plaintiff was in no acute distress and appeared to be more comfortable than on previous exam. (Tr. 425)  He also noted that she had mildly antalgic gait.  (Tr. 425)  Dr. Hamler adjusted plaintiff's prescriptions.  (Tr. 424)   He prescribed new prescriptions for Cymbalta and Hydrocodone-Acetaminophen and scheduled a follow up appointment in two weeks. (Tr. 424-425)

Plaintiff presented to Dr. Hamler again on June 27, 2013.  (Tr. 422)  She reported that the Cymbalta prescription was helping with her mood.  (Tr. 422)  Dr. Hamler ordered a new lumbar MRI to determine if plaintiff's degenerative disc disease had progressed, but no interval changes were noted.  (Tr. 433-434)

On July 31, 2013, plaintiff presented to Dr. Hamler and reported that she was continuing to do well with her current medication regimen.  (Tr. 453)  Her mood was "excellent" and she

6

was "excited that she [was] able to do activities again that she hadn't been able to (dishes, shopping)."  (Tr. 453)  Plaintiff said she was "moving again," and had lost weight.  (Tr. 453)  Dr. Hamler ordered a DEXA Bone Density Scan on August 13, 2013 which revealed no evidence of osteopenia or osteoporosis.  (Tr. 455-457)

On October 19, 2013, plaintiff went to an emergency room of Summa Akron City and St. Thomas Hospitals.  (Tr. 480)  She reported that she had been moving and was on her feet a lot this week and, as a result, had overworked her knee.  (Tr. 480)  She stated that she takes Vicodin for chronic back and knee pain, but had run out because she was taking it more often.  (Tr. 480)  Plaintiff was discharged with an Ace wrap, crutches and a Lidoderm patch. (Tr. 480)

On October 24, 2013, plaintiff followed up with Dr. Hamler and requested a refill of Vicodin.  (Tr. 469-470)   Dr. Hamler changed plaintiff's pain prescription to Percocet and ordered an MRI of her right knee.  (Tr. 469, 474)  He also gave her an injection.  (Tr. 472)  An X-ray image taken on October 24, 2013 confirmed degenerative arthritis and other chronic findings.  (Tr. 474)  The post-hearing MRI taken on November 11, 2013, was "incomplete and motion degraded" but revealed a small joint effusion, a small Baker's cyst with some articular cartilage thinning and loss.  (Tr. 477-478)  There was also abnormal signal within the posterior horns of the menisci, but it was "difficult to determine with certainty if these were degenerative in nature or related to meniscal tears."  (Tr. 478)  The impressions of the MRI physician also noted swelling in plaintiff's knee. (Tr. 478)

On October 28, 2013, plaintiff presented to Christopher Rooney, M.D. for bladder incontinence.

### C.  Opinion Evidence

#### 1.  May 2010 – Examining Physician, Meghan Sullivan, M.D.

Plaintiff met with Dr. Meghan Sullivan one time in May 2010.  Plaintiff told Dr. Sullivan that she had to stand for her entire shift at her job unless she has a doctor's note. (Tr. 306)  Dr. Sullivan wrote a letter "to whom it may concern" in May 2010 stating that "Ms. Losh has a problem with her left knee and does not need to be standing for more than 10-15 minutes at a time.  Please make allowances for her condition and allow her sit as much as possible."  (Tr. 308)

#### 2.  November 2011 – State Agency Medical Consultant, Steve McKee, M.D.

Dr. Steve McKee, a state agency medical consultant, reviewed plaintiff's medical records on November 11, 2011 and opined that plaintiff could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could stand and/or walk for a total of six hours, and could sit for a total of six hours in an eight hour work day. (Tr. 90)  Dr. McKee opined that plaintiff's ability to balance was unlimited but she could only occasionally climb ramps and stairs, stoop, kneel and/or crouch; and could never climb ladders, ropes or scaffolds or crawl. (Tr. 90)  Dr. McKee did not feel that plaintiff had any other limitations in her ability to work. (Tr. 90-91)

#### 3.  June 2012 – Reviewing State Agency Medical Consultant, Jan Gorniak, D.O.

Dr. Jan Gorniak, a state agency medical consultant, reviewed plaintiff's medical records on June 5, 2012 and opined that plaintiff could frequently lift and/or carry 10 pounds, could stand and/or walk for a total of two hours, and could sit for a total of six hours in an eight hour

work day. (Tr. 104)   Dr. Gorniak also limited plaintiff's postural abilities to occasionally climbing ramps/stairs; never climbing ladders, ropes or scaffolds; occasionally balancing, stooping, kneeling and crouching; and never crawling.  (Tr. 105)  Dr. Gorniak also opined that plaintiff should avoid all exposure to workplace hazards such as machinery and heights.  (Tr. 106)

### 4.  August 2012 - Treating Physician, Scott Hamler, M.D.

On August 2, 2012, Dr. Hamler completed a "medical assessment of ability to do work" form.  Dr. Hamler opined that plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently. (Tr. 382)   He stated that plaintiff could stand and/or walk for a total of two hours in an eight hour workday.  He opined that she was unlimited in her ability to sit. (Tr. 382)  He opined that she could frequently balance, could occasionally stoop, but could never climb, crouch, kneel or crawl.  (Tr. 383)  Dr. Hamler also stated that plaintiff's ability to push and/or pull was limited by her back and knee pain. (Tr. 383)  He opined that plaintiff would miss work about twice a month due to her impairments.  (Tr. 383)

### 5.  May 2012 – Psychological Consultative Examiner – Joshua Magleby, Ph.D.

Plaintiff attended a one-time psychological evaluation appointment with consultative examiner, Joshua Magleby, Ph.D. on May 30, 2012.  (Tr. 360-365)  Dr. Magleby noted that plaintiff's disability was a physical disability.  (Tr. 364)  However, he also diagnosed anxiety disorder and adjustment disorder with depressed mood, chronic. (Tr. 364)  He assigned a GAF scale score of 65.  (Tr. 364)  For his prognosis, Dr. Magleby stated, "[g]iven this claimant's history and presentation [including reported and observed symptoms], improvement from current

levels of functioning is unlikely as symptoms have remained fairly static.  The symptoms observed appear to be chronic."  (Tr. 364)  However, he opined that her functioning was fairly average compared to adults of a similar age.  (Tr. 364-365)

### D.  Testimonial Evidence

#### 1.      Losh's Testimony

Ms. Losh testified at the hearing on November 6, 2013.  (Tr. 46)  She was 57 years old when the hearing took place.  (Tr. 46)  She had obtained a GED equivalent of a high school education. (Tr. 46)  Plaintiff testified that she had performed some seasonal work for a magazine order company in January, February and March of 2013.  (Tr. 46-47)  She testified that she had been laid off at the end of that job.  (Tr. 53)

Ms. Losh testified that she is unable to work because she can't walk from her car to the parking lot. (Tr. 49)  She also testified that she has extreme pain sitting at a desk all day.  (Tr. 49) Plaintiff also testified to some experience with difficulty concentrating, partly due to pain, and partly due to pain medication. (Tr.49-50, 57)

Plaintiff does not drive.  (Tr. 50)  She lives in a one bedroom apartment.  (Tr. 50) Plaintiff testified that she receives assistance from her son to do her shopping and her laundry. (Tr. 51)  Plaintiff does her own cooking.  (Tr. 51)  She testified that she does this in phases because she can only stand for five minutes at a time.  (Tr. 51)

Plaintiff testified that her current height is 5'8". (Tr. 51)  At the time of the hearing, plaintiff testified that she had recently lost 50 pounds and that her current weight was 290 pounds.  (Tr. 52)

Plaintiff testified that she has back pain all day, every day.  (Tr. 56)  She testified that her back pain affects her sciatic nerve and goes down her legs into her toes.  (Tr. 56)  Plaintiff

testified that her prescription for Xanax is to treat the nerve pain that runs down her sciatic nerve. (Tr. 60)

Plaintiff was using a cane on the date of the hearing.  (Tr. 56)  She testified that she uses a cane almost all of the time.  (Tr. 57)  She testified that she has been using the cane for much of the year leading up to the hearing and that her doctor was aware of it.  (Tr. 57)

Plaintiff also testified that she has joint disease in her knees.  (Tr. 59)  Plaintiff stated that she has knee pain all day, every day.  (Tr. 59)  She testified that she has swelling in her knees that is worsened with walking.  (Tr. 59)  She testified that she needs to elevate her legs a couple times a day to alleviate swelling.  (Tr. 60)

Plaintiff testified that she has been treating with Dr. Hamler since 2010 or 2011.  (Tr. 60) Plaintiff disagrees with Dr. Hamler's assessment that she is capable of sitting all day to work. (Tr. 62-63)

### 2.    Vocational Expert's Testimony

Vocational Expert ("VE"), Gene Burkehammer, testified at the hearing.  (Tr. 52-55)  Mr. Burkehammer considered plaintiff's past work history to include the positions of nanny, cashier, telephone operator and telemarketer.  (Tr. 54)  The VE was asked to consider a hypothetical individual similar in age and education to plaintiff who would be able to perform a full range of sedentary work, but would need a sit/stand option. (Tr. 55) The ALJ further clarified the sit/stand option, stating, "[s]o, the sit/stand option that I'm including here to move, stand, shift about for brief periods of time in order to obviate any pain or discomfort; not to move far away from your work station."  (Tr. 55)

Given the characteristics of this hypothetical individual, the VE testified that such an individual would be able to perform the sedentary jobs which plaintiff had previously performed.

11

(Tr. 55)

When questioned by plaintiff's attorney, the VE testified that it is usually unacceptable with most employers for an employee to elevate their legs occasionally to reduce swelling.  (Tr. 64)  The VE also stated that most employers would not tolerate two or more absences per month. (Tr. 64)  However, the VE opined that the use of a cane at all times would not affect an individual's ability to perform the sedentary jobs which were considered plaintiff's past sedentary work. (Tr. 64)

## IV.  Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.     The ALJ's Decision

The ALJ issued a decision on December 9, 2013.  A summary of his findings is as follows:

1. Losh met the insured status requirements of the Social Security Act through December 31, 2016. (Tr. 23)

2. Losh had not engaged in substantial gainful activity since April 1, 2010, the alleged onset date.  (Tr. 23)

3. Losh has the following severe impairments: Lumbar degenerative disc disease; degenerative changes/arthritis of the bilateral knees and right hip; and obesity.  (Tr. 23)

13

4.  Losh does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 24)

5.  Losh has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a); however, Losh requires a "sit/stand option" defined as the ability to alternate between sitting and standing positions as necessary during the course of the workday to alleviate pain/discomfort/stiffness, while remaining on task and at her workstation no less than 90 percent of the time, with usual and customary breaks. (Tr. 25)

6.  Losh is capable of performing past relevant work as a customer service/call center representative and this work does not require the performance of work related activities precluded by the claimant's residual functional capacity.  (Tr. 34)

Based on the foregoing, the ALJ determined that Losh had not been under a disability from April 1, 2010 through the date of the decision.  (Tr. 34)

## VI.  Parties' Arguments

Plaintiff filed her brief on August 11, 2015.  (Doc. 14)  Plaintiff argues that the ALJ improperly reconsidered the findings of the ALJ on plaintiff's previous disability claim.  (Doc. 14, p. 11-12)  Plaintiff argues that the doctrine of collateral estoppel and controlling case law preclude the ALJ from reaching different findings than the findings made by the previous ALJ. See *Drummond v. Commissioner of Social Security,* 126 F.3d 837 (6th Cir. 1997); and *Dennard v. Secretary of Health & Human Services,* 907 F.2d 598 (6th Cir. 1990).

Plaintiff also contends that there was no substantial evidence to support the finding that plaintiff could perform past relevant work. (Doc. 14, p. 12-14)  Plaintiff argues that the hypothetical formed by the ALJ did not include the fact that plaintiff would not be able to remain on task at her workstation for 90% of the time. (Doc. 14, p. 13-14)  Thus, plaintiff argues that the VE's testimony was based on an inaccurate portrayal of plaintiff's remaining abilities.  (Doc. 14, p. 14)

14

Finally, plaintiff argues that the ALJ committed reversible error when he did not consider the limitations from the state agency physicians in forming his decision regarding plaintiff's residual functional capacity.  Plaintiff argues that the ALJ failed to explain why he did not include the limitations opined by these agency physicians when he reached his decision.

Defendant filed a brief on October 26, 2015.  (Doc. 16)  Defendant contends that there was substantial evidence supporting the ALJ's residual functional capacity determination.  (Doc. 16, p. 7-10)  Regarding plaintiff's argument that the ALJ failed to adhere to the prior ALJ's 2006 findings, defendant argues that this argument is irrelevant in the present context.  (Doc. 16, p. 7-9)  At most, the ALJ's failure to adhere to the prior findings amounts to harmless error. Defendant points out that the prior ALJ's findings limited plaintiff's abilities to a range of medium work.  (Doc. 16, p. 7)  In the present claim, the ALJ did not adopt the findings of the prior ALJ decision because new evidence warranted changed findings, including a *reduction* in plaintiff's RFC.  (Doc. 16, p. 7-8)  Defendant argues that, because the ALJ's RFC was more restricted in the present matter, based on new evidence, the fact that he did not include a postural limitation to only occasional stooping (as limited by the prior ALJ's decision) is irrelevant and, at most, harmless error.  With regard to the claim currently before the court, the VE opined that the plaintiff could perform her past relevant work as a customer service and call center representative and a telephone operator.  (Doc. 16, p. 8)  These positions do not require that plaintiff perform any stooping.  For this reason, defendant contends that the determination of whether or not plaintiff had any limitations in how often she could stoop is completely immaterial to her ability to perform these past relevant jobs. (Doc. 16, p. 8)

Defendant also argues that the ALJ's omission that plaintiff would be on task at least 90% of the workday was harmless.  (Doc. 16, p. 8)  Defendant points to the fact that the ALJ's

15

hypothetical included the condition that the individual be able to alternate between sitting and standing as necessary during the course of the day to alleviate pain.  The VE testified that such an individual, even if allowed to switch between sitting and standing *at will,* would still be able to perform plaintiff's past relevant work.  (Doc. 16, p. 9)  Accordingly, defendant contends that, even if plaintiff's at will standing option was limited to, at most, ten percent of the workday, this could only mean that plaintiff's limitations would be *less* work preclusive than found by the VE.  (Doc. 16, p. 9)

Finally, defendant argues that plaintiff's argument that the ALJ erred by failing to mention or include the limitations opined by the state agency reviewing physicians was, at most, harmless error.  (Doc. 16, p. 9)  Defendant argues that, even if these additional limitations were added to the hypothetical question posed to the VE, it would not have altered the plaintiff's ability to perform the jobs opined by the VE.  (Doc. 16, p. 9-10)  The sedentary jobs that the VE believed plaintiff would still be able to perform did not require any stooping or any other postural limitations that were identified by Dr. Gorniak.  (Doc. 16, p. 9-10)  Thus, any alleged error in the ALJ's consideration of Dr. Gorniak's opinion, was harmless.  (Doc. 16, p. 9-10)

Plaintiff filed a reply on November 5, 2015.  (Doc. 17)  Plaintiff argues that the ALJ's residual functional capacity finding is not supported by substantial evidence because it is based on vocational expert testimony that never occurred. (Doc. 17, p. 1)  Plaintiff argues that the VE did not testify, as argued by defendant, that plaintiff could perform her past relevant work if she had the option to sit and stand at will.  (Doc. 17, p. 2)  Plaintiff also argues that the vocational expert did not testify that plaintiff could perform her past relevant work while at her work station no less than 90% of the time.  (Doc. 17, p. 2)  Plaintiff argues that these distinctions are significant in determining whether the ALJ's decision related to plaintiff's RFC was supported

16

by substantial evidence.   The court has considered the parties' arguments and its recommendation is explained below.

**VII.    Law & Analysis**

   **A.  Standard of Review**

   This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).   Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

   The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).   This is so because there is a "zone of choice" within which the

17

Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

In the present matter, the ALJ decided that plaintiff was not disabled at Step Four of the sequential analysis because he found that she had the residual functional capacity to perform her past relevant work.  (Tr. 25-34)  As stated above, under the sequential analysis, the claimant had the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).

### B.  Res Judicata Argument

Plaintiff argues that the ALJ improperly rejected the prior ALJ's finding that Ms. Losh was "limited to only occasional stooping."[2]  Plaintiff argues that the doctrine of collateral estoppel and precedent from the Sixth Circuit Court of Appeals precluded the ALJ from reconsidering this prior finding related to plaintiff's ability to stoop.

In making this argument, plaintiff relies on *Drummond v. Commissioner of Social*

---

[2] Plaintiff's Brief at 12, ECF Doc. No. 12, Page ID# 553.  The court notes that this characterization of the prior ALJ's "finding" is misleading – because of incompleteness – at best and disingenuous at worst.

18

*Security*, 126 F.3d 837 (6th Cir. 1997) and *Dennard v. Secretary of Health & Human Services*, 907 F.2d 598 (6th Cir. 1990).  In *Drummond*, the Sixth Circuit Court of Appeals, relying on prior decisions such as *Dennard,* recognized that

> Res judicata is a common-law concept which prescribes that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980) (citing *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L. Ed. 195 (1876)). Res judicata and the related concept of collateral estoppel (which refers to issue preclusion) are intended to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id.* (citing *Montana v. United States*, 440 U.S. 147, 153-54, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979)). Res judicata bars the relitigation of the same claim or cause of action while collateral estoppel bars the relitigation of the same issue.

> Courts have traditionally applied the concept of res judicata to decisions by administrative agencies when a final judgment has been reached. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 16 L. Ed. 2d 642, 86 S. Ct. 1545 (1966).

In *Drummond*, the Commissioner had disregarded a prior ALJ decision and argued that *res judicata* did not apply to the Social Security Administration because it was not a party to the proceedings before the ALJ.  The Sixth Circuit Court of Appeals rejected this argument and held that the Commissioner could not have it both ways.   The Commissioner could not argue that *res judicata* applied only to the claimant and prevented *her* from raising issues that had already been decided in prior administrative hearings and yet not be bound by those same decisions.  The court held,

> Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ. We reject the Commissioner's contention that the Social Security Administration has unfettered discretion to reexamine issues previously determined absent new and additional evidence. To

allow the Commissioner such freedom would contravene the reasoning behind 42 U.S.C. § 405(h) which requires finality in the decisions of social security claimants. Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.

*Drummond*, 126 F.3d at 842. While the *Drummond* decision is controlling over this court, it is inapplicable to the ALJ decisions on Ms. Losh's claims for disability.

Ms. Losh previously filed an application for disability benefits on August 1, 2003. (Tr. 79)  As with the present claim, the prior ALJ denied Ms. Losh's application at Step Four of the sequential analysis.  In his decision, dated April 26, 2006, ALJ Mark Carissimi determined that plaintiff had the residual functional capacity to perform work at the medium exertional level.  He stated, "[s]pecifically, she is able to lift, carry, push, and pull 50 pounds occasionally and 25 pounds frequently; she can sit for six hours of an eight-hour day; and stand and/or walk for six hours of an eight hour day.  She is limited to only occasional stooping."  (Tr. 82)

The present application for disability benefits was filed by plaintiff on July 2011.  (Tr. 21)  In the procedural history portion of his decision, ALJ Ciccolini acknowledges the prior 2006 decision and notes that the claimant was found not disabled with a residual functional capacity for a range of medium work.  ALJ Ciccolini further states, "[b]ecause new and material medical and other evidence currently of record warrants changed findings, including a reduction in the claimant's residual functional capacity, I have not, pursuant to the requirements of *Drummond*, adopted the findings of the prior ALJ Decision."  (Tr. 21)

In his December 9, 2013 decision, ALJ Ciccolini found that the plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the additional limitation that "plaintiff required a sit/stand option defined as the ability to alternate between sitting and standing positions as necessary during the course of the workday to alleviate

20

pain/discomfort/stiffness, while remaining on task and at her workstation no less than 90 percent of the time, with the usual and customary breaks."  (Tr. 25)  The ALJ's finding regarding plaintiff's residual functional capacity makes no mention of plaintiff's limitations regarding stooping, as did the prior ALJ decision from 2006.  ALJ Ciccolini does not indicate in his decision that plaintiff is unlimited in her ability to stoop.  He simply doesn't mention her limitations in relation to stooping.

The *Drummond* decision recognizes that a change in the claimant's medical condition would change the binding nature of a previous ALJ decision on a prior claim.  Here, the ALJ determined that the claimant's condition had worsened and he reached a new, *more restrictive* finding as to plaintiff's residual functional capacity.  The court agrees with defendant that the ALJ's failure to address plaintiff's ability to stoop is immaterial.  The ALJ limited plaintiff's RFC to sedentary work, which primarily involves sitting with *no* requirement that the worker *ever* be required to stoop.  Moreover, the past relevant work which the VE opined that plaintiff had the residual functional capacity to perform does not involve stooping.  Plaintiff had the burden of proof at Step Four in the sequential analysis.  She failed to convince the ALJ that she lacked the RFC to perform past relevant work.  The ALJ's decision was based on substantial evidence in the record and the fact that the ALJ did not specifically address the prior ALJ's finding regarding plaintiff's limited ability to stoop did not have any impact on the outcome of plaintiff's claim.  For these reasons, plaintiff's collateral estoppel argument is not well taken.

### C.    Residual Functional Capacity

Plaintiff argues that the ALJ's hypothetical question to the VE did not accurately reflect the plaintiff's residual functional capacity.  (Doc 14, p. 12-14)  Specifically, plaintiff argues that the hypothetical did not include the limitation that plaintiff was unable to remain on task and at

her workstation no less than 90% of the time.  (Doc. 14, p. 14, Doc. 17)  Thus, plaintiff argues

that it was improper for the ALJ to include this detail in his finding related to plaintiff's residual

functional capacity.

> In forming his hypothetical question to the VE, the ALJ stated,

> * * *  So, I want you to consider a claimant similar in age and education who
> would have the following RFC:  said individual would be able to perform a full
> range of sedentary work, but would need a sit/stand option.  And I know that the
> DOT does not highlight or specify a sit/stand option in sedentary work, but that it
> can be established by professional testimony from a vocational expert.  So, the
> sit/stand option that I'm including here is defined as follows:  not of any long
> duration.  It's just to move, stand, shift about for brief periods of time in order to
> obviate any pain or discomfort; not to move far away from your work station.  Do
> you understand the parameters of the RFC?

In response, the VE testified that the individual would be able to perform plaintiff's past relevant

work.  (Tr. 54-55)

> In his decision, the ALJ further clarified his finding related to plaintiff's residual

functional capacity.  (Tr. 25)  The decision states:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform sedentary work as defined in 20 CFR
> 404.1567(a); however, the claimant requires a "sit/stand option," defined as the
> ability to alternate between sitting and standing positions as necessary during the
> course of the workday to alleviate pain/discomfort/stiffness, while remaining on
> task and at her workstation no less than 90 percent of the time, with usual and
> customary breaks.

> It appears that, in forming his hypothetical to the VE, the ALJ did not specify that the

plaintiff would be permitted to take normal and customary work breaks and be off task 10% of

the time.  If the hypothetical question to the VE would have expressly included this clarification,

or if plaintiff's counsel would have asked the VE about an employer's tolerance of an employee

being off task, there would be no question as to the evidentiary support for the ALJ's decision

regarding plaintiff's residual functional capacity.  However, this further clarification would have been unlikely to have any impact on the VE's opinion.

In *Rabbers v. Comm'r of Soc. Sec.*, 582 F3d 647, 654, (6th Cir. 2009) the Sixth Circuit Court of Appeals recognized that a matter should not be remanded for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights.  The court cited *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 535 (6th Cir. 2001) and *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969) noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality."

Here, the VE testified that there would be jobs available to an individual with plaintiff's impairments even if the individual needed to stand and sit at will to ease pain.  Common sense dictates that such an individual would be permitted to take the customary breaks allowed by most employers and that including this detail in the hypothetical question would have made no difference to the VE's opinion.  For this reason, the court agrees with defendant that the ALJ's failure to include these standard specifications in his hypothetical question to the VE was harmless error.

### D.    Dr. Gorniak's Limitations

Plaintiff's final argument is that the ALJ failed to include limitations from the state agency physician, Dr. Jan Gorniak, when forming his decision regarding plaintiff's residual functional capacity.  Plaintiff also argues that the ALJ failed to articulate any explanation as to why he did not include Dr. Gorniak's limitations in his findings.  (Doc. 14, p, 14-16)

In his decision, the ALJ makes the following statement:

23

> I have, however, accorded the opinions of the non-examining State agency medical consultants, who have advised that the claimant could perform a range of light work, including standing/walking up to 6 hours per day, little weight, because I concluded that these consultants did not adequately consider the claimant's weight in light of her spinal and lower extremity impairments pursuant to the directives of SSRs 96-97 and 02-1p.

Because Dr. Gorniak was a non-examining state agency reviewing physician, the ALJ's above statement applies to her opinion.  As explained by the ALJ, he determined that plaintiff's residual functional capacity was *more restrictive* than Dr. Gorniak and assigned little weight to her opinion.  The fact that the ALJ did not include the postural limitations from Dr. Gorniak's opinion in his determination of plaintiff's residual functional capacity is of no consequence here. The ALJ determined that plaintiff's residual functional capacity was limited to sedentary jobs, which involve mostly sitting.  The past relevant work which the VE opined that plaintiff could still perform does not involve the postural limitations stated in Dr. Gorniak's opinion.  Thus, it was unnecessary for the ALJ to provide a more detailed explanation as to why he assigned little weight to Dr. Gorniak's opinion in the present context.  His failure to provide a more detailed explanation of the weight he assigned to Dr. Gorniak's opinion did not prejudice Ms. Losh or deprive her of any substantial rights.

## VIII.   Conclusion

Based on the foregoing analysis, the court should find that the ALJ properly considered and weighed the evidence, and that the ALJ's decision is supported by substantial evidence. Moreover, even if the court were to construe the ALJ's decision to contain the errors argued by plaintiff, those contended errors are of no consequence here because they did not affect the outcome of the ALJ's decision or prejudice Ms. Losh in any way.  Because Ms. Losh has not demonstrated a basis upon which to reverse or remand the Commissioner's decision, I

24

recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §

405(g).

Dated: June 3, 2016                                          s/Thomas M. Parker
                                                            Thomas M. Parker
                                                            United States Magistrate Judge


## OBJECTIONS

     **Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the Circuit Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**